**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| **IN RE:** | § | **MISC. CASE NO. 4:22-MC-01-O** |
| **ETHICS INVESTIGATION OF** | § | |
| **ALLEGATIONS RAISED BY UDF** | § | |
| | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION REGARDING UNITED DEVELOPMENT FUNDING'S NOTICE OF ETHICAL VIOLATIONS BY PROSECUTION TEAM

Before the Court is United Development Funding ("UDF")'s Notice of Ethical Violations by Prosecution Team ("Notice") filed February 7, 2022.[1] On March 15, 2022, a "Response by Filter Team AUSA to 'Notice of Ethical Violations' Filed by UDF" ("USAO Resp.") was filed by Interested Party Douglas Brasher on behalf of the United States Attorney's Office for the Northern District of Texas ("USAO" or "Government") and as "filter team prosecutor now assigned to the matters involving UDF." On March 22, 2022, Interested Party Christine Edson ("Edson" or "Agent Edson") filed a response ("Edson Resp.") to UDF's Notice to address the allegations therein that are directed at her. Finally, on April 22, 2022, Interested Party Nicholas Bunch ("Bunch" or "AUSA Bunch") filed a "Court's Redacted Declaration of Nicholas Bunch" ("Bunch Decl.") to address the allegations in the Notice that are directed at him.[2]

---

[1] The Court notes this Notice was brought by corporate-petitioner UDF. Throughout this document, the Court will make reference to UDF executives Hollis Greenlaw, Cara Obert, Benjamin Wissink, or Brandon Jester (collectively, "executives"). The UDF executives were criminally convicted in Cause No. 4:21-CR-289-O—from which this Notice also originates.

[2] Bunch initially filed his Motion for Leave to File Ex Parte Response to Notice of Ethical Violations by Prosecution Team [ECF No. 16], on March 15, 2022. Attached to the Motion, Bunch submitted his Redacted Declaration in response to UDF's Notice of Ethical Violations. In an April 11, 2022, Order [ECF No. 30], the Court Granted Bunch's Motion for Leave and ordered Bunch to file under seal an *ex parte*, unredacted version of his Declaration and ordered the USAO to file a corresponding privilege log setting forth specific alleged privileges to each sentence that was redacted in Bunch's Redacted Declaration. The USAO timely filed its privilege log and the Court, having examined the privileges asserted by the USAO and all relevant, applicable law, both sustained and overruled certain requested redactions in the Declaration [ECF No. 34]. In an *ex parte* order, the Court set forth

1

On May 11, 2022, UDF filed an "Omnibus Reply in Support of Its Notice" replying to the various responsive filings of the Interested Parties. (UDF's Corrected and Amended Omnibus Reply in Support of its Notice of Ethical Violations by Prosecution Team ("Omnibus Reply").) In its Notice and Omnibus Reply, UDF seeks a Court Order holding that respondents Bunch, Edson, and the USAO "each committed ethical violations in attempting to carry out their otherwise solemn obligations on behalf of the United States." (Omnibus Reply at 1). Ultimately, UDF requests the Court to "take whatever action it deems" necessary and appropriate. (Notice at 8 ("necessary"); Omnibus Reply at 30 ("appropriate").

## I.    PROCEDURAL HISTORY[3]

In February 2016, a magistrate judge in the Northern District of Texas, Dallas Division, signed a search warrant and, pursuant to that warrant, the Federal Bureau of Investigation ("FBI") raided UDF's headquarters in Grapevine, Texas, seizing "electronic information and approximately 742 boxes of hard copy documents" relating to a securities-fraud investigation. (USAO Resp. at 2) A miscellaneous case was subsequently opened in the Dallas Division, *In Re: In the Matter of the Search of UDF, 1301 Municipal Way Grapevine, Texas 76501*, on August 23, 2021. (*See generally* Case No. 3:21-MC-284-B-BT). Within this miscellaneous action, UDF filed its Motion for Return of Property Pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure arguing the following:

> [G]iven the privilege breaches, the overbreadth of the search, and the Government's utter failure to complete its review within a reasonable period of

---

rulings on the requested redactions and tendered to the USAO the Court's Redacted Declaration of J. Nicholas Bunch. The Court also ordered the USAO to file the Court's Redacted Declaration of J. Nicholas Bunch. The USAO filed the Court's Redacted Declaration of J. Nicholas Bunch on April 22, 2022 [doc. 35]. For purposes of this miscellaneous matter, the Court will consider and reference only the Redacted Declaration of J. Nicholas Bunch ("Bunch Decl.") and no other version of the Declaration.

[3] The Court will not attempt to address the extensive history of each UDF proceeding in detail. However, for purposes of this miscellaneous action, the Court finds a review of certain procedural events is necessary for context.

time, the only appropriate remedy would be an order requiring the [United States Attorney's Office for the Northern District of Texas] to return all originals and copies of materials seized from UDF's headquarters on February 18, 2016.

(UDF's Motion for Return of Property Pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure ("UDF's 41(g) Mot.") [ECF No. 1, pg. 24, Case No. 3:21-MC-284-B-BT]. During the pendency of UDF's 41(g) motion, four UDF executives were charged on October 15, 2021, in a multi-count indictment in the Northern District of Texas, Fort Worth Division. (*See generally* Case No. 4:21-CR-289-0.)

On October 25, 2021, within the miscellaneous matter, *In Re: In the Matter of the Search of UDF, 1301 Municipal Way Grapevine, Texas 76501*, the USAO filed under seal its "Government's Sealed Notice to the Court," informing the Court of the following:

> [T]he government files this notice out of an abundance of caution to inform the Court that the filter team is currently investigating at least four instances where members of the prosecution team may have been exposed to privileged materials. Although this investigation is not complete, the government believes it owes a duty of candor to inform this Court of the existence and status of this investigation prior to the Court's ruling on the UDF's Motion for Return of Property Pursuant to Rule 41(g).
>
> . . . .
>
> In this process of responding to UDF's [41(g)] Motion in this action, [the Government] learned more about the background and history of the investigation and privilege review process that occurred . . . . UDF's counsel provided a list of filter terms to the government and that the filter teams used those terms to filter the electronic evidence and all of the physical evidence once it had been scanned and OCR'ed.
>
> . . . .
>
> [The Government] discovered four documented instances where members of the prosecution team, despite the procedures set forth above, may have been exposed to privileged material: (a) once by reviewing boxes of physical documents seized from UDF prior to those documents being scanned and filtered with UDF search terms, and (b) three times reviewing boxes of physical documents after they had been scanned.

. . . .

On the four dates at issue [], the prosecution team reviewed boxes of documents that had been seized from and/or near the offices of various individuals. None of the boxes they reviewed were seized from or near [attorney] Melissa Youngblood's office. It does not appear that members of the filter team reviewed the physical boxes prior to the review by the filter team. However, in at least one instance, the review by the prosecution team occurred several months after a review of the same boxes by the attorneys for one of the defendants, during which no privilege was asserted on behalf of the individual or UDF.

. . . .

The filter team's investigation into these matters is ongoing and is expected to be complete by mid-November. The government will expeditiously update the Court as additional facts are learned.

(Government's Sealed Notice to the Court) [ECF No. 19, pgs. 1-4, 3:21-MC-284-B-BT (internal citations omitted)]. UDF filed its Motion to Unseal the next day, October 26, 2021. (ECF No. 20 in 3:21-MC-284-B-BT.) Two days after the Government filed its Sealed Notice to the Court, on October 27, 2021, the Court held a hearing on UDF's 41(g) motion and UDF's Motion to Unseal the Government's Sealed Notice to the Court. [ECF No. 20-1, Case No. 3:21-MC-284-B-BT]. The Court took under advisement the matter regarding a privilege log associated with UDF's 41(g) motion, and, with respect to UDF's motion to unseal, provided "the Government time to complete its investigation" and instructed the government to provide the Court with a supplement to its Notice. (Transcript of October 27, 2021, hearing, ECF No. 23, pg. 89, Case No. :21-MC-284-B-BT.)

On November 10, 2021, the Government filed its first supplement to its Government's Sealed Notice, entitled "Government's Supplement." [ECF No. 22, Case No. 3:21-MC-284-B-BT]. In its first Supplement, the Government stated, *inter alia*, that it "returned all of the documents over which UDF asserted privilege on a document-by-document basis, even though some of them are not privileged." [ECF No. 22, pg. 2, Case No. 3:21-MC-284-B-BT (emphasis

omitted)]. Five days later, on November 15, 2021, the Government filed its second supplement to its Government's Sealed Notice to the Court, informing the Court as follows:

> The filter team has interviewed an individual who was present during each of the five documented instances where members of the prosecution team reviewed physical boxes of documents, as set forth [in] the Sealed Notice. The 302s of those interviews will be provided to the Court as soon as they are finalized. In the interim, the government provides the following information to the Court:
>
> - Members of the prosecution team reviewed physical boxes of documents collected during the search of UDF on additional dates besides those documents in Exhibits 1 through 5 of the Sealed Notice.
>
> - The filter team did not review any physical boxes prior to the reviews by the prosecution team.
>
> - During their review of the physical boxes, members of the prosecution team employed a very conservative approach to potentially privileged documents—especially segregating a document if it contained Melissa Youngblood's name or the name of any other attorney.
>
> - Once Ms. Youngblood's name was seen on a document, members of the prosecution team immediately stopped their review of the document and segregated it. They did not review the document further for substance or for making an actual privilege determination.
>
> - No member of the prosecution team learned any privileged information during their review of the physical boxes, and thus did not use any privileged information to further their investigation.
>
> - No member of the prosecution team passed on any information from any potentially privileged document to any other person.
>
> - No current member of the prosecution team from the U.S. Attorney's Office [] has reviewed any of the original boxes of physical evidence at any time.

[ECF No. 27, Case No. 3:21-MC-284-B-BT (internal citations omitted)]. That same day, the miscellaneous case [Case No. 3:21-MC-284-B-BT), containing UDF's 41(g) motion and the Government's sealed notice and supplements, was transferred by electronic order to the Northern District of Texas, Fort Worth Division, and was assigned case number 4:21-MC-16-O.

On November 23, 2021, United States District Judge Reed O'Connor held a status conference for the newly transferred case.  Per the hearing's transcript, the two issues that were discussed were (1) the "approximately 130 boxes of [viewed] documents that had not been cleared for privilege" and (2) the 7.4 million documents in the government's possession that contain "hit" terms associated with potential privileges.  (November 23, 2021, Transcript ("Nov. 23, 2021, Tr.") at 5, 14.)  Regarding the 7.4 million documents, the Court instructed the Government: "I don't know whose they are, give to whoever is entitled to it, your discs, and then you destroy your 7.4." (Nov. 23, 2021, Tr. at 14.)  Regarding the boxes of documents, the transcript reads as follows:

> [GOV]: There was a taint team for the boxes that were taken from Melissa Youngblood's, the in-house counsel's office, those were taken by the taint team and have – the prosecution team never had access to those boxes until UDF's counsel, Mr. Howell, came and reviewed those boxes and tagged this stuff as privileged and that was then segregated permanently.
>
> The stuff that he essentially cleared, you know, that he didn't claim privilege over, those were provided to the prosecution team.  The ones that he tagged as privileged have been returned recently.
>
>       . . . .
>
> [COURT]: So describe for me, explain for me why you made that notice, and what is the significance of that.
>
> [GOV]: So those boxes, as I understand it, those boxes were documents that were not from Melissa Youngblood's office.
>
> [COURT]: Okay. And so these 100 to 150 boxes that we're talking about is Melissa Youngblood set?
>
> [GOV]: No.
>
> [COURT]: So then why are you drawing that distinction?
>
> [GOV]: Because, as the prosecution team and AUSA Bunch was only present during one of the five days, I think that are covered by that notice.
>
>       . . . .

[GOV]: They found documents, and what's been explained to me as we've interviewed them is, if they came across an attorney's name, Melissa Youngblood's name or any other attorney's name, they immediately segregated it as potentially privileged. They didn't make a privilege call one way or the other on them.

[COURT]: Okay. Just for my benefit, why are they going through as opposed to a taint team, if there was a taint already in place? Because you colleague here suggested there was no taint team in place.

[GOV]: There was. I'm not sure I have the reason as to why it was done that way. What's been explained to me is that it was just much easier to use the physical boxes than it was to use the electronic scans of those boxes, where those filter terms would have been applied to them. Just the system was slow –

. . . .

[COURT]: And so my question to you though is, why are nonfiltered team individuals then –

[GOV]: Right.

[COURT]: – Looking at boxes that have not been cleared by the filter team?

[GOV]: I don't have a great answer for that. And that's why I filed that notice was to let the Court know that this happened.

[COURT]: Uh-huh.

[GOV]: I don't think that's the best practices.

. . . .

[GOV]: . . . I think UDF counsel had access to those boxes, and he came and was interested in reviewing boxes from Melissa Youngblood's office, and he never made a request to view any of the other boxes. And this was during a period when those boxes had not been scanned yet for the electronic terms to be applied to them.

. . . .

[COURT]: So I guess what is confusing me here is you seem to be indicating that, at the time that AUSA Bunch and his coagents went through these documents improperly, although you say not intentionally or sanctionable, that it's UDF's fault that they did so. I don't think I follow you.

[GOV]: Right. I'm not saying it's UDF's fault that that happened.

[COURT]: Or that they tap-dallied somehow that allowed that mistake to occur.

[GOV]: Well, that's where I think the case law does suggest that – and that goes, you know, to our waiver argument – the speed with which and the specificity with which they identify their privilege and assert their privilege.

. . . .

[COURT]: You've taken them all.  We're going to give you a list of names and a list of terms, I don't know what they gave you, some list of things and you run this search, and if any of these documents are alerted because of these terms, you need to put your people on hold until either you determine that it's privileged or we can get it and see those documents and determine they're privileged.

So I don't understand how you're just getting around to it.  Maybe you are operating on government time, to get around to it, after bankers hours doesn't apply, so you hadn't scanned them.

So Mr. Bunch and his people are like, well, I don't know whose fault this is, but we're going to look at these documents.  I don't find that to be waiver at all.

(Nov. 23, 2021, Tr. at 15-6; 16-7; 18; 18-9; 19; 19; 21.)  Ultimately, pertaining to the boxes of

documents, the Court Ordered the Government as follows:

[GOV]: – I want you to take a list of the documents that have been triggered by your search protocols, and then I want you to pull the hard copies of those documents, and I want you to determine whether they're privileged or not privileged . . . . If they're obviously privileged, I want you to return those documents to your colleague.  And then let him know what you don't believe is privileged and why.  And then if you can't reach an agreement on that, then you or they ask me to review it.

(*Id*. at 27.)

Subsequently, on January 1, 2022, in UDF executives' criminal case, 4:21-CR-289-O, the

Court issued an Order denying the Defendants' Motion to Dismiss for Violations of Defendants'

Fourth, Fifth, and Sixth Amendment Rights.  (*See* ECF No. 206, Case No. 4:21-CR-289-O.)  In

that Order, the Court noted that the "prosecution team is not in any possession of any privileged

materials," and the Court opened the instant miscellaneous matter to "investigate any ethical lapses that may have occurred." [ECF No. 206, pg. 8, n. 1; 9, Case No. 4:21-CR-289-O].

## II.    UDF'S ARGUMENTS REGARDING ALLEGED ETHICAL VIOLATIONS

In the Notice of Ethical Violations before the Court, UDF brings two claims under the umbrella of ethical misconduct.  First, against AUSA Bunch and Agent Edson, UDF claims that they "intentionally and repeatedly intruded into attorney-client privileged communications of UDF and the UDF executives and concealed those intrusions from UDF, the UDF executives, and the Court." (Notice at 2 (emphasis omitted).)  Next, against the USAO, UDF asserts the "prosecution violated its duty of candor to the Court."  (*Id*. at 7 (emphasis omitted).)

### A.    <u>Alleged Attorney-Client Privilege Intrusion</u>

As to the first issue of alleged violations of unethical intrusion into UDF's  attorney-client privilege, UDF claims AUSA Bunch and Agent Edson, throughout their ongoing investigation into UDF and its executives, violated specific provisions in the Texas Rules of Evidence, the Texas Rules of Criminal Evidence, the Federal Rules of Evidence, the American Bar Association ("ABA")'s Standards for Criminal Justice, the Department of Justice ("DOJ")'s Justice Manual, and the Texas Disciplinary Rules of Professional Misconduct ("Texas Disciplinary Rules").  (*Id*. at 3-6.)

#### 1.    Rules and Standards Cited by UDF

UDF first defines the scope of the attorney-client privilege as follows:

> "[P]rivileged information" refers to the "information of a client protected by the lawyer client privilege of Rule 503 of the Texas Rules of Evidence or Rule 503 of the Texas Rules of Criminal Evidence or by the principles of attorney-client privilege governed by Rule 501 of the Federal Rules of Evidence for United States District Courts and Magistrates."

(Notice at 2 (internal citation omitted) (quoting Tex. R. Evid. 503(b)); *see* Tex. R. Crim. Evid. 503 (citing Tex. Disciplinary R. Pro. Conduct 1.05(a) and FRE 501.)  Next, UDF cites to the following provision of the ABA's Standards for Criminal Justice:

> [W]hen searching an attorney's office [during execution of a search warrant], or any place where attorney-client or other privileged material is likely to be located or is discovered, the prosecutor should arrange for evidence to be recovered in such a manner as to prevent or minimize any unauthorized intrusion into confidential relationships or information under law.

(Notice at 2 (quoting ABA Standards for Criminal Justice: Prosecutorial Investigations § 2.8(h) (2008).)  UDF additionally cites the following provisions contained in the DOJ's Justice Manual:

> [W]hen conducting searches of business organizations with materials in the possession of legal advisors, DOJ policy requires law enforcement to:

- "[T]ake the least intrusive approach," and "consider[] . . . the use of a subpoena."

- Obtain the "express approval of the United States Attorney or pertinent Assistant Attorney General," who should only grant approval "when . . . less intrusive means have been considered and rejected."

- "[C]onsult with the Criminal Division [of the DOJ]."

- Draft "special instructions to the searching agents regarding search procedures and procedures to be followed to ensure that the prosecution team is not "tainted" by any privileged material inadvertently seized during the search."

- "[T]o protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a 'privilege team' should be designated, consisting of agents and lawyers not involved in the underlying investigation."

- Prohibit the privilege team from "disclos[ing] any information to the investigation/prosecution team unless and until so instructed by the attorney in charge of the privilege team."

- Other post-search protocols designed to insulate the Prosecution Team from accessing privileged communicates, to ensure the immediate return of the privileged materials, and to provide a process for promoting non-privileged evidence to the prosecution team.

(Notice at 3 (quoting U.S. Dep't of Just., Justice Manual § 9-13.420 (2021) (hereinafter, "Justice Manual")).)

Furthermore, UDF argues, "when performing an investigative function, '[a] prosecutor should not use illegal or unethical means to obtain evidence or information, or employ, instruct, or encourage others to do so.'" (Notice at 3 (quoting ABA Standards for Criminal Justice: The Prosecution Function, Standard § 3-1.4(b) (2017)).) UDF further argues that "[s]imilarly, in communicating with witnesses, 'the prosecutor should know and abide by law and ethics rules regarding the use of deceit and engaging in communications with represented, unrepresented, and organizational persons.'" (*Id.*) UDF continues by asserting that "[a] lawyer shall not: habitually violate an established rule of procedure or of evidence." (Notice at 4 (quoting ABA Standards for Criminal Justice: The Prosecution Function, Standard § 3-3.4(b)), citing Tex. Disciplinary R. Pro. Conduct 3.04(c)(1) (internal quotations omitted).) Finally, UDF states "a prosecutor has the responsibility to see that justice is done, and not simply to be an advocate." (*Id.* (emphasis omitted) (quoting Tex. Disciplinary R. Pro. Conduct 3.09 cmt. 1.))

### 2.     UDF's Specific Assertions Against AUSA Bunch and Agent Edson

In its Notice, UDF provides the Court with an "outline[] [of] a course of conduct by former AUSA Nicholas Bunch and Christine Edson[,] an FBI Special Agent, who is a licensed attorney in the state of Texas, which constitutes a prima facie case of violations of the [] ethical standards and disciplinary rules." (Notice at 4.) UDF argues the following actions/inactions constitute ethical violations of UDF's attorney-client privilege by AUSA Bunch and Agent Edson:

- The presentation for authorization of a federal search warrant, rather than considering a less intrusive approach, to a United States Magistrate Judge which failed to inform the Judge that there would be a likely encounter with vast quantities of attorney client privileged information and to set forth reasonable steps that would be taken to protect the privacy of those communications or comply with the requirements of the Justice Manual,

- The failure to assign a continuous filter team Assistant United States Attorney to establish a proper privilege protection screen to protect the privilege during the evidence inventory and review process,

- The failure to implement or adhere to DOJ protocols to protect the privacy of the attorney-client communications,

- The failure to prevent members of the Prosecution Team from accessing privileged communications,

- Permitting the review and inventory of privileged materials before they were even turned over to the FBI Team assigned to serve as a filter review team,

- Reviewing, on multiple occasions, the seized physical documents before they had been cleared by any filter team attorney,

- Permitting Staff Attorneys from the SEC to surreptitiously review the seized physical documents containing attorney client information before they had been cleared by any filter team attorney,

- Actively requesting that an FBI agent intrude into privileged communications that had been segregated by the FBI filter team by secretly penetrating the screen and taking "screen shots" of the non-cleared segregated information,

- Refusing to disclose to UDF, counsel for UDF Executives and the Court that they knew that the "BIDMAS" protocol the FBI had implemented purportedly to prevent Prosecution Team access to electronic Privileged Materials was not working properly and that privileged materials were, thus, being accessed by the Prosecution Team,

- Actively concealing form UDF's counsel and counsel for UDF Executives that they actually reviewed physical documents containing privileged materials prior to having been cleared to do so by a Filter Team AUSA,

- Refusing to confirm to UDF's counsel and counsel for UDF Executives whether they had actually promoted privileged material to the prosecution team,

- Actively concealing from UDF and the Court until two days before the hearing on the initial Rule 41(g) motion that they had in fact reviewed seized privileged materials prior to such materials being cleared by a Filter Team AUSA,

- Purposefully delaying [] the seizure of the privileged materials [from] February 18, 2016, until October of 2021[.] [Waiting] to return the bulk of the privileged material until after the indictment was returned,

12

- Conducting an interview of UDF's attorney-retained forensic auditors after they were in fact notified that they were hired under privilege,

- Continuing the conduct of an interview of UDF's attorney-retained forensic auditors after they were warned by the forensic auditor that he had been hired under privilege,

- Sharing the contents of the interview conducted [with UDF's forensic auditors] conducted in violation of the attorney-client privilege with other members of the prosecution team,

- Falsely reporting to a United States Magistrate Judge in the Search Warrant Application Affidavit in paragraph 85 that the person who had posted the information on the website "Investors for Truth" was not "anonymous," and in fact that person was known personally to the government and that his true name was in fact Kyle Bass. Similarly, the affidavit further falsely reported to the Magistrate Judge in paragraph 85 that the letter to Whitley Penn was not written by an "anonymous" source, and in truth and in fact that person was personally known to the government, that his true name was Kyle Bass and that he had previewed the letter with the government before he went it to the auditors.

(Notice at 4-6 (internal citations omitted).)

### B.    <u>Duty of Candor</u>

As to its second issue involving alleged ethical violations by the Government, specifically alleging the USAO failed to comply with its duty of candor to the Court, UDF asserts the USAO violated Texas Disciplinary Rules and the ABA's Standards for Criminal Justice. (Notice at 6-8.) Specifically, UDF alleges the following:

#### 1.    **Rules and Standards Cited by UDF**

UDF first cites to the Texas Disciplinary Rules, which states:

A lawyer shall not knowingly "make a false statement of material fact or law to a tribunal" or "offer to use evidence that the lawyer knows to be false." "If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts."

(Notice at 6 (quoting Tex. Disciplinary R. Pro. Conduct 3.03(a)(1), (5), 3.03(b)) (internal citations omitted).) UDF then turns to the ABA's Standards, stating:

13

> In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations." A prosecutor "should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness or third party." Further, a prosecutor "should correct a prosecutor's representation of material fact or law that the prosecutor reasonably believes is, or later learns was, false, and should disclose a material fact or facts when necessary to . . . avoid misleading a judge or factfinder.

(Notice at 6 (quoting ABA Standards for Criminal Justice: The Prosecution Function, Standard §

3-1.4(a), (b)) (internal citations omitted).)

### 2.  UDF's Specific Assertions Against the USAO

UDF argues the following with regard to alleged violations of the duty of candor to the

Court by the USAO:

> At the status conference held before this Court on the pending Rule 41(g) motion on November 23, 2021 . . . the prosecutor stated that[,] "Because, as the prosecution team and AUSA Bunch was only present during one of the five days, I think that [we] are covered by that notice . . . then the investigative agents looked at it on other days." Because the Prosecutor had just interviewed the Prosecution Team Agents on November 12, 2021, however, he was unaware that those representations to the Court were[,] at best, inaccurate.
>
> . . . .
>
> [O]n December 20, 2021 the government provided a FBI 302 to the UDF Executives which purported to be a report of a November 12, 2021 interview of FBI Special Agent Edson . . . reveal[ing] that AUSA Bunch and the Prosecution Team agents had, prior to clearance by any Filter Team, reviewed, on multiple occasions beyond the five incidents previously documented and revealed by the government, the physical materials containing privileged materials which had been seized from UDF. According to the interview of Agent Edson, former AUSA Bunch, on at least one occasion, was present when he gave SEC Staff Attorneys unfettered access to the seized physical materials. Moreover, Agent Edson indicted that there were "additional evidence review days of physical evidence review that were not documented, but could not recall the exact number of review days." Agent Edson confirmed that even after the evidence was scanned and loaded into "BIDMAS" the "investigative team continued to review the physical evidence," that still had not been cleared by a Filter Team. Agent Edson confirmed that AUSA Bunch continued to review the physical evidence as "it was very difficult to review the evidence electronically."

. . . .

> [H]aving interviewed Agent Edson on November 12, 2021, the undersigned believes that the Prosecutor had a duty to reveal to the Court the known multiple additional privilege breaches by the Prosecution Team in response to the Court's questioning on November 23, 2021.

(Notice at 7-9 (emphasis and internal citations omitted).)

### III.   RESPONSES BY AUSA BUNCH, AGENT EDSON AND THE USAO

#### A.   Alleged Attorney-Client Privilege Intrusion by AUSA Bunch and Agent Edson[4]

##### 1.   AUSA Bunch

In response to UDF's allegations against him, AUSA Bunch submitted a declaration which, after an in-camera inspection at the USAO's request, was docketed with redactions for certain privileged information as detailed in footnote 2, supra.  In his redacted declaration, AUSA Bunch states he "did not engage in any substantive review of attorney-client privileged information," nor did he "take any investigative step, or direct anyone to take any investigative step, based upon review of, or even knowledge of, information that was protected by the attorney-client privilege." (Bunch Decl. at 1.)  Under the heading umbrella of "attorney-client" privilege, in his redacted declaration, AUSA Bunch specifically addresses six allegations from UDF's Notice of Ethical Violations:

1. Ethical violation(s) based on the execution of a search warrant at UDF's corporate headquarters;

2. Ethical violation(s) in connection with interviews of forensic auditors from Navigant and with the sharing of contents of those interviews with other members of the prosecution team;

3. Concerns regarding the BIDMAS software program at the FBI;

---

[4] UDF's argument of violations of the attorney-client privilege pertains only to AUSA Bunch and Agent Edson.  Accordingly, the USAO did not respond to the Notice's attorney-client privilege argument.

4. Questions about the physical review of boxes of evidence by agents and Bunch prior to review by a filter team;

5. The USAO's alleged failure to continuously maintain a filter AUSA on the matter; and,

6. The failure to return privileged material;

(Bunch Decl. at 2, 10, 11, 12, 14.)

With regard to the search warrant executed at UDF headquarters and procedures relating to the potential attorney-client privileged documents retrieved during the execution, AUSA Bunch presents the following response:

> The government's decision to execute a search does not constitute the basis for an ethical violation, and UDF has not cited any ethical rule to supports [sic] its allegation. [] [It] is uniquely the province of the [USAO] and its law enforcement partners to determine the appropriate investigative techniques to use in each case. The use of a warrant (as opposed to a subpoena) is no evidence of an intention to invade the attorney-client privilege.
>
> . . . .
>
> I began considering how to protect attorney-client privileged information well before the FBI executed a search warrant at UDF's corporate headquarters in February 2016.
>
> . . . .
>
> To that end, I met many times with the FBI concerning appropriate investigative steps.
>
> . . . .
>
> At the time, I understood that Melissa Youngblood was an employee of UDF with the title Chief Operating Officer. At no point in time, to my knowledge, did Ms. Youngblood have the formal title at UDF of "General Counsel." I knew that Ms. Youngblood had previously been with the Hallet & Perrin law firm prior to her employment with UDF. I was aware that UDF—represented by attorney Barrett Howell—had produced records pursuant to a subpoena issued by the [SEC] that included communications involving Ms. Youngblood in her role as Chief Operating Officer and had not asserted privilege over those communications. UDF—again, represented by Mr. Howell—also allowed corporate employees to discuss communications with Ms. Youngblood during their testimony before the

SEC.  However, UDF employees had occasionally described Ms. Youngblood as UDF's "general counsel."

Because Ms. Youngblood wore two hats—mainly a business role (which likely would not be privileged) but sometimes a legal role (which could be privileged)—I worked with the [USAO] and the FBI to establish a filter team and a filter protocol for any evidence seized from Ms. Youngblood's office and surrounding area. I followed the policy and procedures of the Department of Justice ("DOJ") in doing this. I was aware of U.S. Attorney's Manual Section 9-13.420, which requires consultation with the Policy and Statutory Enforcement Unit ("PSEU") at DOJ before executing a search of the office of an attorney—even one who wears more than one hat like Ms. Youngblood. Following PSEU's direction, I prepared a filter-team memorandum, which was submitted, along with a copy of the search warrant affidavit, to the PSEU for review prior to presenting the affidavit to Magistrate Judge Tolliver. I provided all the search warrant materials to my supervisor, Deputy Criminal Chief Katherine Miller, who submitted them to U.S. Attorney John Parker for approval. Both my supervisor and the U.S. Attorney approved the decision to apply for a search warrant.

I also worked with the FBI and the [USAO] to employ filter attorneys for this matter . . . . I was not authorized to assign any attorney to the role of filter AUSA. Senior management in the [USAO] made the decision to attach a filter attorney to the matter and also chose who that would be. The Office assigned AUSA Jamie Hoxie to be one of the filter attorneys on the case. The FBI assigned Associate Division Counsel ("ADC") Todd Celeste to be another filter attorney on the case . . . [they] were assigned to the filter positions prior to the execution of the search warrant, and I provided both with copies of the affidavit and filter protocol prior to the FBI's execution of the warrant.

I also attended the FBI's search warrant briefing, along with [supervisor] Miller and [AUSA] Hoxie [and ADC Todd Celeste]. Agent Edson led the briefing. We discussed with the agents during the briefing the approved protocol for searching Ms. Youngblood's office. The search of her office, as well as any surrounding areas, would be performed by the filter team, led by ADC Celeste. I explained to the agents at the briefing that should they encounter any information they believed to be potentially attorney-client privileged in other locations at UDF, they should contact ADC Celeste, who would determine whether to seize it and, if so, how to handle it.

Following the search, I engaged in good-faith efforts with company counsel and counsel for certain executives to address privilege-related issues. I requested that [UDF attorney Howell] provide me with a list of search terms in order for the government to electronically search and identify potentially privileged material to be segregated from the investigative team.

Mr. Howell provided me with a list of terms on February 25, 2016. It was four pages and contained approximately 31 law firms and approximately 100 individual attorneys. I forwarded Mr. Howell's email to AUSA Hoxie on that same day. To ensure that our list of terms was as comprehensive as possible, I later requested permission from Mr. Howell to share the list with counsel for certain UDF executives . . . . Howell gave me permission to share UDF's list with counsel for the UDF executives.

On March 18, 2016, I separately emailed [UDF executives' counsel]. I do not recall receiving a response from [five attorneys]. [One attorney] provided a response that he was not aware of any additional terms. [Another attorney] provided one additional name, which I then sent to AUSA Hoxie and ADC Celeste.

. . . .

I never represented to anyone that the government would review each box of evidence from the UDF corporate headquarters twice—once by a filter team using the electronic search terms and again by the investigation team . . . the vast majority of records from UDF are not privileged . . [T]he search terms provided by Mr. Howell were designed for use in an electronic database. They could not be mechanically applied to all of the physical evidence.

. . . .

[W]e engaged with UDF's counsel in multiple respects concerning the Youngblood physical records . . . UDF had not assert[ed] a blanket privilege with respect to all matters involving Ms. Youngblood as she primarily served a business role at the company. We made multiple efforts with Mr. Howell to determine the parameters of UDF's assertion of privilege with respect to Ms. Youngblood's business and legal roles at UDF.

. . . [I]n July 2016, I sent an email to Agent Christine Edson, AUSA Hoxie, ADC Celeste, and two other agents . . . I do not know if UDF provided any clarity to USA Hoxie or ADC Celeste in this regard. As a result, the filter team continued to screen the Youngblood material from the investigative team.

In April 2018, we again sought clarify from UDF concerning the scope of any privilege relating to Ms. Youngblood. I asked Mr. Howell for a meeting . . . .

. . . .

On May 15, 2018, I sent an email to Mr. Howell memorializing a phone call and advising him that he could review the physical records from Ms. Youngblood's office and surrounding areas and coordinate with ADC Celeste on a time to do so at the FBI. The first review by Mr. Howell was scheduled for May 31, 2018, and on multiple occasions thereafter, he and others reviewed materials at the FBI.

On June 13, 2018, I sent Mr. Howell an email stating: "I understand Todd Celeste that you and your colleagues have made two trips to the FBI to review materials seized in the search of UDF from Melissa Youngblood's office and surrounding areas. My understanding is that you have flagged about one box of material as privileged. Please confirm for me that the material in the boxes that have been reviewed—approximately 13-15 boxes—are not privileged and can be released to the investigative team.

Mr. Howell responded the same day: "Confirmed."

I then asked ADC Celeste if he could identify the boxes that Mr. Howell and his team had reviewed. ADC Celeste provided me with a list of "1B" numbers, the internal tracking numbers used by the FBI. I sent that list to Mr. Howell, identifying the boxes he reviewed by specific number. Later that day, Mr. Howell sent me an email stating: "Based on the boxes we've reviewed, it appears that these documents have already been reviewed by the agents." He noted that "[t]here are several documents that have attached sticky notes with hand written notes on them, many of which are signed or initialed by the agents. The notes are clearly not part of the original document. We have not removed or altered any of the agents' notes."

On July 14, 2018, I sent Mr. Howell's email to ADC Celeste and asked to discuss it with him. DC Celeste sent me an email: "I'll have to see what he is referring to. I recalled that I reviewed the boxes over a year ago and pulled items for Jamie to look at. She came over and looked at them and I placed them back in the box. I don't recall making notes, but I may have. I'll have to look at what he is talking about. The investigative has not looked at any of those boxes. I can tell you that."

Later that day, Mr. Howell sent me another email: "Nick: I spoke with Todd this morning and now understand the context of the few sticky notes we saw on the UDF documents. I appreciate the explanation and do not have any issues—I was only raising the issue because it appeared that non-filter team agents may have reviewed some of the documents. I now understand that's not the case—most appreciated."

(Bunch Decl. at 2-10.)

AUSA Bunch next responds to UDF's allegations that he and Agent Edson committed an ethical violation by interviewing forensic auditors from Navigant and shared the contents of those interviews with other members of the prosecution team. AUSA Bunch avers:

I had several conversations with Mr. Howell concerning our interest in interviewing representatives from Navigant.

> We were aware that Navigant had been retained by UDF for multiple projects in or about 2014, and that for one or more of the projects, Navigant had been retained by counsel for UDF, thereby creating a privilege concern. As early as August 3, 2018, I met with Mr. Howell and discussed the Navigant issue . . . . Mr. Howell had always indicated to me that UDF wanted to be transparent in the investigation and allow us access to the information that we needed . . . . To that end, we asked to interview Navigant. On August 14, 2018, I sent an email again asking to interview Navigant. On August 15, 2018, I received an email from Mr. Howell indicating that he would talk to the "independent trustees . . . to discuss the Navigant privilege issue." On August 21, 2018, I have handwritten notes of a conversation with Mr. Howell where we discussed the "Navigant privilege issue" and that UDF was "working through it."

> . . . .

> In February 2019, Agent Edson scheduled interviews with the two former Navigant forensic accountants who had worked on UDF matters: John Riley and Anthony Creamer. On February 25, 2019, Agent Edson interviewed Mr. Riley. I did not attend the interview. From my review of the FBI 302 documenting the interview, Mr. Riley explained the general nature of his work for UDF and identified other individuals, including Mr. Creamer, as having more information.

> On February 27, 2029, Agent Edson and I interviewed Mr. Creamer. From my review of the FBI 302 documenting the interview, Mr. Creamer explained the three projects for which Navigant had been retained. We specifically instructed him not to discuss with us anything concerning the projects for which his firm had been retained by counsel. We did not ask him questions concerning his work at counsel's direction.

(Bunch Decl. at 10, 11.)

Bunch next addresses UDF's allegations concerning the FBI's BIDMAS document review

software program:

> At some point, I went to FBI headquarters in order to access BIDMAS through the FBI network and not through a VPN connection from the [USAO]. The first time I did so was on September 17, 2018. While attempting to review records, I noticed an email that had not been flagged but which might be potentially privileged. I do not remember the substance of the email. I did not study it or consider it long enough to describe it at this time. I immediately stopped my review and alerted Agent Edson, who took immediate remedial steps.

> . . . .

UDF has made allegations based on a screenshot of the BIDMAS software by Forensic Accountant ("FOA") Scott Martinez that shows the filter process blocking certain emails related to a nonprivilged email. Contrary to UDF's assertion that we were "[a]ctively requesting" an "intru[sion]" into privileged material and "secretly penetrating the screen and taking 'screen shots of the non-cleared segregated information," this demonstrates how the filter process works. I cannot see what is behind the blocked information in FOA Martinez' email, but that is the point. It was restricted from viewing by the investigative team.

(Bunch Decl. at 12-14 (internal citations omitted).)

Regarding UDF's allegations that he and Agent Edson physically reviewed boxes of seized

evidence prior to review by the filter team, AUSA Bunch provides the following:

Regardless of who reviewed the evidence—the agents, the SEC, or me—I am confident that each person who looked at any physical evidence did so in a manner consistent with our ethical obligations as federal prosecutors, federal agents, or federal regulators. To my knowledge, no one other than the filter team reviewed or attempted to review information potentially covered by the attorney-client privilege.

In January 2019, I reviewed boxes from [UDF executive] Todd Etter's office with Agent Edson at the FBI. In the same manner that I have reviewed evidence in any other context [] during the course of my career, I took care to ensure that I did not substantively review any material that was potentially privileged. To that end, any items that were identified as potentially privileged were immediately segregated and not reviewed for substance. I am aware that Agent Edson's documentation shows that potentially privileged items form Mr. Etter's office were segregated. Once Agent Edson or I had any indication that an item might be privileged, we set aside the item and did not review it any further. On subsequent days, the agents conducted similar reviews of the seized evidence from the offices and surrounding areas of other UDF executives. To the best of my knowledge, no one (other than the filter team) reviewed substantively privileged material.

(Bunch Decl. at 12-13 (internal footnotes omitted).)

As to UDF's allegations that the USAO did not continuously maintain a filter AUSA on

the matter, AUSA Bunch states:

There was a period after AUSA Hoxie transferred to the [USAO] in New Jersey before another AUSA (Lisa Dunn) was assigned as filter attorney. AUSA Hoxie left the Dallas office in or about September 2018. During that time, however, AUSA Hoxie remained with the [DOJ] and was available to consult with ADC Celeste (or any subsequent filter attorney from the FBI) as necessary. Significantly, Mr. Howell knew that AUSA Hoxie had left the [USAO] in Dallas. He continued

to communicate with the subsequent FBI filter attorney, other agents, and me concerning filter-related issues. He never complained about the absence of a filter AUSA assigned to the case.

(Bunch Decl. at 14.)

Finally, AUSA Bunch responds to UDF's allegations surrounding his alleged failure to return privileged material as follows:

> The timing here is important. After the search, the government returned all the electronic devices to UDF. UDF could have identified anything it considered privileged at that time and asked for its return. The company did not. Instead, it made a request for the government to return certain physical documents related to ongoing business needs. Mr. Howell's initial request was very broad and would have entailed significant work for the case agents. After a meet-and-confer process that later included [counsel for UDF executive Hollis Greenlaw], UDF provided a narrower set of requests and the FBI provided copies of physical records. UDF did not seek return of its allegedly privileged material at that time.

> In January 2019, nearly three years later, UDF filed its first Rule 41(g) motion and asked for the return of all physical search warrant evidence, except for items the government intended to use. That was not a workable arrangement for the government. After negotiations with counsel, UDF modified its request and agreed to accept a copy of all the search warrant materials (with the government retaining the originals). UDF did not demand the return of privileged material at that time.

> In or about February 2020, new counsel became involved in the case and raised issues regarding privilege, the filter team, and the return of privileged materials. Initially, Neal Stephens, who was representing [UDF executive] Cara Obert, asked questions relating to the privilege. I responded that the privilege belonged to UDF and not Ms. Obert. Thus, I would discuss UDF's privilege with UDF's counsel. . . . At or near this time, the [USAO] assigned AUSA Dunn as the filter attorney. I was not a party to AUSA Dunn's communications with UDF's counsel related to this matter and do not know what they discussed.

> Despite the inquiries in March 2020, another eighteen months passed before UDF filed a second Rule 41(g) motion on this issue in August 2021. During this period, UDF was negotiating a non-prosecution agreement with the government. When the negotiations did not lead to such an agreement, UDF sought a second review by the Office of the Deputy Attorney General in April 2021.

(Bunch Decl. at 14-5.)

## 2.    Agent Edson

Agent Edson, in her Response to UDF's Notice [doc. 19], filed March 22, 2022, provides

she "did not violate any 'ethical rules,' and that UDF cannot show otherwise." (Agent Edson's

Response to UDF's Notice of Ethical Violations ("Edson Resp.") at 2.)  In support, Agent Edson

provides three main arguments:

> (1) UDF has not alleged or shown that Special Agent Edson violated
> the Texas Disciplinary Rules of Professional Conduct; (2) UDF has not
> alleged or shown that Special Agent Edson violated any ABA Standards;
> and (3) Section 9-13.420 of the DOJ's Justice Manual is not an "ethical
> rule" and failure to follow it is not a valid basis for imposition of Court
> discipline.

(Edson Resp. at 3, 4, 8 (emphasis omitted).)

The crux of Agent Edson's first argument—that UDF failed to show she violated Texas'

Disciplinary Rules of Professional Conduct—is that the Texas attorney disciplinary rules do not

apply to "her actions as an FBI investigator in the criminal matter." (Edson Resp. at 3.)  In support,

Agent Edson argues the following:

> Rule 3.04 supplies fairness standards for persons who act as advocates in
> "Adjudicatory Proceedings" and Rule 3.09 provides additional standards for
> lawyers engaged as a "prosecutor in a criminal case."  Neither Rule applies to
> Special Agent Edson in this matter.
>
>        . . . .
>
> [UDF] simply states that [Edson] "is a licensed attorney in the State of
> Texas."  Critically, UDF fails to mention that Special Agent Edson is an "inactive"
> member of the Texas Bar who has never practiced law in any capacity.  More
> importantly here, it is undisputed that Special Agent Edson has never acted as a
> lawyer or prosecutor at any point during the DOJ's investigation or prosecution of
> the criminal matter.
>
>        . . . .
>
> UDF cites to the phrase from Rule 3.04(a) that a lawyer shall not
> "unlawfully obstruct another party's access to evidence," but UDF cannot tie that
> to any action of Special Agent Edson.  UDF simply references the individual
> defendants' filing in the criminal matter that alleged that the DOJ and its

prosecutors *generally* failed to timely return evidence obtained through execution of a search warrant. But this does not show that *Special Agent Edson* obstructed any party's access to evidence, much less that she did so unlawfully.

    . . . .

    Rule 3.04(c)(1) states that a lawyer "representing a client before a tribunal" shall not "habitually violate an established rule of procedure or of evidence." Special Agent Edson has never represented any client in a proceeding before this, nor any other Court of Law, so it would have been impossible for her to have ever violated Rule 3.04(c)(1) . . . . Likewise, Rule 3.09 applies only to a lawyer who is acting as a "prosecutor in a criminal case," but Special Agent Edson has never been a "prosecutor" in this or any other case.

(Edson Resp. at 3, 4 (emphasis in original) (internal citations omitted).)

Likewise, in her second responsive argument—that UDF failed to show she violated any ABA Standards—Agent Edson states that the "none of the ABA standards cited in UDF's notice constitute 'ethical rules' that any party could 'violate'" and, additionally, that the ABA Standards do not apply to her actions in the criminal case or related investigation because she was not serving as an attorney in those matters. (Edson Resp. at 5 (emphasis omitted).) Regarding the ABA Standards as purported ethical rules, Agent Edson argues the following:

    Both sets of ABA Standards to which UDF cites are "aspirational" guidelines that describe "best practices" and expressly state that they "are not intended to serve as the basis for the imposition of professional discipline, to create substantive or procedural rights for accused or convicted persons, to create a standard of care for civil liability, or to serve as a predicate for a motion to suppress evidence or dismiss a charge." Accordingly, these ABA Standards are not ethical "rules" in any sense and cannot be used as the basis to discipline anyone.

(Edson Resp. at 5 (internal citations omitted).) Next, Agent Edson argues that "in additional to not being 'ethical rules'" in the first instance, none of the ABA Standards cited by UDF would apply to Special Agent Edson's actions." (*Id.*) In support, she states:

    Each of the Sections cited by UDF expressly applies only to a "prosecutor," which is defined as a person "***who serves as an attorney*** in a governmental criminal investigation." "[I]t is undisputed that Special Agent Edson never acted as a "prosecutor" or an attorney at any point during the DOJ's investigation or

prosecution of the criminal matter, and so, again, UDF's citation to these ABA Standards is completely unrelated to [her] actions in this case.

. . . .

UDF cites to ABA [Standards] which state[]: "When searching an attorney's office, or any place where attorney-client or other privileged material is likely to be located or is discovered, *the prosecutor **should** arrange* for the evidence to be recovered in such manner as to prevent or minimize any unauthorized intrusion into confidential relationships or information under law." "*[A] prosecutor **should not*** use illegal or unethical means to obtain evidence or information, or employ, instruct, or encourage others to do so," [and] "in communicating with witnesses, *the prosecutor **should*** know and abide by law and ethics rules regarding the use of deceit and engaging in communications with represented, unrepresented, and organizational persons."

. . . .

UDF cannot explain how Special Agent Edson, who is not a prosecutor, could have ever violated aspirational guidance about the steps the "prosecutor" *should but is not required to take* when directing a search of potentially privileged materials, obtaining evidence, or speaking with witnesses.

(Edson Resp. at 5, 6, 6-7 (emphasis in original) (internal citations omitted).)

Additionally, Agent Edson, addressing the specific provisions of the ABA Standards related to the search of UDF's offices, obtaining evidence, and communication with witnesses, states:

[W]hen law enforcement searched UDF's offices, it did "arrange for evidence to be recovered in such manner as to prevent or minimize any unauthorized intrusion into confidential relationships or information privileged under law. Specifically, although Special Agent Edson "was the team leader on the day of the search," she "did not physical [sic] search anyone's office to include Youngblood's office." Instead, Todd Celeste, the assigned FBI filter agent, "lead the search of [] Youngblood's office." None of UDF's other allegations relate to the recovery of evidence or the searching of the premises as detailed by ABA [Standards]. UDF has also failed to identify how Special Agent Edson "illegally" or "unethically" obtained evidence in contravention of ABA [Standards]. The Court has already rejected the individual defendants' *Franks* motion, challenging the sufficiency of Special Agent Edson's affidavit supporting the search warrant used to seize the documents at issue. And an EDTX court has dismissed a *Bivens* action[] predicated on the same claim. Finally, UDF fails to allege any incident where [she] violated any "law and ethics rules regarding the use of deceit" in communicating with a witness.

(Edson Resp. at 7-8 (emphasis in original) (internal citations omitted).)

The third and final argument Agent Edson presents in her Response is that "UDF fails to show how Special Agent Edson violated any "ethic rules" with respect to the [DOJ's] Justice Manual." (Edson Resp. at 8.) Similarly to her argument regarding the ABA Standards, Agent Edson argues "[t]he Justice Manual does not supply 'ethical rules' nor does it create any enforceable rights or independent obligations outside of the DOJ, ethical or otherwise." (*Id.* (quoting *United States v. Tracts 31A, Lots 31 & 32*, 852 F.3d 385, 392, n.7 (5th Cir. 2017)).) Specifically, she cites the following DOJ Justice Manual provision:

> These guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative or litigative prerogatives of the Department of Justice.

(Edson Resp. at 9 (quoting DOJ's Justice Manual § 9-13.430).) Agent Edson argues that UDF's allegations that she "somehow violated the guidance in Section 9-13.420 by reviewing non-privileged materials seized from individuals who were not lawyers and who were not 'serving in the capacity of legal advisor to the organization' are both incorrect and inapposite for purposes of this miscellaneous matter."[5] (*Id.* at 10.)

### B.    Alleged Violation of Duty of Candor by USAO[6]

In its Response to UDF's Notice, the USAO makes four arguments: (1) the USAO notified the Court of the original prosecution team's exposure to potentially privileged material ("PPM");

---

[5] Agent Edson argues that UDF's interpretation of section 9-12.420 is overbroad, as the guidelines are "for searches of 'premises of an attorney' who is a 'suspect, subject or target' of an investigation and 'searches of business organizations where such searches involve materials in the possession of individuals serving in the capacity of legal advisor to the organization.'" (Edson Resp. at 10 (emphasis omitted) (internal citation omitted).)

[6] UDF's Notice asserts allegations of violations of the duty of candor to the court solely against the USAO. Accordingly, AUSA Bunch and Agent Edson did not respond to any duty of candor allegations.

(2) the USAO did not make any knowingly false statement in providing the same information to the Court at the status conference; (3) UDF incorrectly claims the USAO knowingly made materially false statements; and (4) the record does not support a finding that the USAO made any false statements, much less a finding of materiality. (*See* Response by Filter AUSA to "Notice of Ethical Violations" Filed by UDF ("USAO Resp.") at 4,5,6, and 9.)

In its first responsive argument—that the USAO "notified the Court of the original prosecution team's exposure to potentially privileged materials"—the USAO states it filed its initial notice of potential exposure "before the [41(g)] Dallas hearing," and immediately after it discovered "the contents of five FBI reports[7] . . . [that] indicated that in 2019, members of the prosecution team had reviewed boxes of seized documents and encountered potentially privileged information." (USAO Resp. at 4 (footnote added).) The USAO notified the Court of this exposure after it "appeared to [the USAO] that [the exposure] had not been previously disclosed to the Court or UDF." (*Id.*) The USAO asserts it did so "in an abundance of caution and pursuant to the duty of candor [] in connection with the pending 41(g) matter." (*Id.* at 4-5.)

Next, the USAO argues it "made no knowingly false statement in providing this same information [regarding the five reports of potential exposure] to the Court at the [November 23, 2021] status conference." (USAO Resp. at 5 (emphasis omitted).) The USAO asserts that the questioning from the Court at the status conference was directed at the issue of "the potential interaction with privileged items on the four out of five days reflected in the Notice [of Potential

---

[7] Regarding the five reports, the USAO states the following:

> The five reports [] indicate that on four of the five occasions, potentially privileged items were encountered and segregated. On a fifth review occasion, no potentially privileged items were encountered. Further, on the four review days on which potentially privileged items were encountered, AUSA Bunch was present at one.

(USAO Resp. at 5 (internal citations omitted).)

Exposure] and the attached FBI reports." (*Id*. at 6.) As the issue before the Court was narrow, the USAO asserts it "answered accurately." (*Id*.)

In its third responsive argument, as stated above, the USAO asserts that "UDF incorrectly claims [the USAO] knowingly made materially false statements." (USAO Resp. at 6 (emphasis omitted).) Regarding the USAO's statements at the November 23, 2021, status conference, the USAO argues such statements "were neither false nor misleading," and provides the following:

> UDF's lack-of-candor contention stems from an FBI 302 [form] that reflects an interview of Special Agent Edson in mid-November [2021]. The 302 was finalized in December [2021], weeks after the status conference. As a threshold matter, the 302 does not state what UDF now contends [the USAO] should have told the Court. For example, the 302 does not state that Mr. Bunch gave SEC staff attorneys "unfettered access" to the seized physical materials. The 302 does note the challenges of reviewing the evidence electronically, but the 302 does not state that Mr. Bunch "continued to review the physical evidence" because of those challenges.
>
> Notwithstanding that, the 302 does not substantiate UDF's accusation against [the USAO] in any event . . . because the 302 has nothing to do with the focus of [the USAO's] challenged comments and the Court's colloquy with [the USAO]. In short, the 302's reference to other possible dates of the prosecution or investigation team's possible review of different boxes than the 120 being discussed is a separate topic. UDF's effort to bootstrap it into a claim that [the USAO] made knowingly false statements when he accurately answered the questions asked of him [] should be rejected.

(USAO Resp. at 6-7.) The USAO further states that it had "already filed [its] supplement and served it on UDF's counsel." (*Id*. at 7 (emphasis omitted).) The USAO avers:

> Critically, eight days before the status conference hearing even occurred, and four days before UDF asked for a status conference, [the USAO] had filed the Supplement [to its Notice of Potential Exposure] and served it on counsel for UDF. In it, [the USAO] provided additional information learned from [the] ongoing investigation. The Supplement [to its Notice of Potential Exposure] specifically states that even though 302s were in progress, [the USAO] felt it appropriate to apprise the Court in the interim that "[m]embers of the prosecution team reviewed physical boxes of documents collected during the search of UDF *on additional dates besides those documented in*" the five FBI reports attached to the Notice [of Potential Exposure].

Thus, the issue about which UDF now claims [the USAO] lacked candor was, in fact, disclosed in writing over a week before the hearing with the information [the USAO] had, even though [the USAO] did not have the 302 yet.

(USAO Resp. at 7-8 (emphasis in original) (internal citations omitted).)

Lastly, the USAO asserts "the Court informed the parties that it had read the supplemental briefing [to its Notice of Potential Exposure]." (*Id.* at 8 (emphasis omitted).) "[The USAO] was also cognizant of the Court's warning to counsel not to belabor the record by repeating everything previously submitted in writing . . . [t]hus, [the USAO] remained focused on the topics the Court was interested in addressing." (*Id.* at 8-9 (internal citation omitted).) The USAO adds:

> In the USAO's fourth and final argument—that "the record does not support a finding that [the USAO] made any false statements, much less a finding of materiality—the office argues the following:  [T]he issues which UDF now complains should have been brought up at the hearing [by the USAO] were also not material, as required to find a violation of Rule 3.03, for all the following reasons.  First, these issues were not germane to the colloquy.  Second, this was a status conference, not an evidentiary hearing or oral argument.  [The USAO's] statements (or lack thereof) had no bearing on the outcome.  Finally, if these issues were truly material to the status conference, then UDF's counsel—having received the Supplement [to the USAO's Notice of Potential Exposure] eight days earlier— would have brought them up when articulating what he hoped to discuss.

(USAO Resp. at 9.)

## IV.    DISCUSSION

### A.    <u>Alleged Intrusion into and Violation of UDF's Attorney-Client Privilege</u>

#### 1.    Agent Edson

The Court first addresses whether AUSA Bunch and Agent Edson violated UDF's attorney-client privilege[8] as UDF asserts in its Notice.  As a threshold matter, the Court finds Agent

---

[8] While the Court will not expound on the importance of the attorney-client privilege, it notes that, generally, in federal courts, the attorney-client privilege prevents disclosures of communications between an attorney and a client where the communication was made while seeking or providing legal services. *See Upjohn Co. v. United States*, 449 U.S. 383 (1981).  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice." *Id.* at 389.

Edson has not violated the Texas Rules of Professional Conduct as those rules do not apply to her actions as an FBI investigator, as opposed to an attorney, in the underlying criminal matter. It is undisputed that she is not and never has been a practicing attorney. (Edson Resp. at 3.) Merely holding a license to practice law does not make Agent Edson an attorney for purposes of the investigation of UDF or the subsequent prosecution of its executives. Nor do her actions, as delineated in UDF's Notice, establish that she was acting as *Bunch*'s agent and communicating with the USAO regarding privileged matters related to legal services. *See Robinson v. Tex. Auto. Dealers Ass'n.*, 214 F.R.D. 432, 450 (E.D. Tex. – 2003) ("Communications between an attorney's agent and the attorney's client can be protected by the privilege when the communication is made in confidence for the purpose of facilitating the rendition of legal services."), citing *United States v. White*, 617 F.2d 1131, 1135 (5th Cir. 1980), *U.S. v. Pipkins*, 528 F.2d 559, 562 (5th Cir. 1976).

Additionally, Agent Edson is correct in her argument that the ABA Standards and DOJ Justice Manual provisions relied on by UDF do not apply to her actions as a non-attorney, nor do they provide a basis for concluding she has committed an ethical violation pursuant to these guidelines and standards. Because Agent Edson is not an attorney and was not acting as an agent for an attorney during the investigation of UDF and subsequent criminal prosecution of its executives, the Court **FINDS** Agent Edson has not committed an ethical violation with respect to the attorney-client privilege as alleged by UDF.

### 2.    AUSA Bunch/The Filter Team

The Court now turns its attention to AUSA Bunch and addresses whether he "intentionally and repeatedly intruded into attorney-client privileged communications of UDF and [its] executives."[9] (Notice at 2.) In its Notice, UDF provides 17 allegations where AUSA Bunch

---

[9] The ABA Standards specifically address their intended scope and intended enforcement:

allegedly violated UDF's attorney-client privilege.  *See*, II. UDF's Arguments, *supra*, pgs. 9-10; *see also* (Notice at 5-7 (internal citations omitted).)  UDF brings its arguments under, *inter alia*, the Texas Disciplinary Rules, which provide a lawyer shall not "unlawfully obstruct another party's access to evidence," and that a lawyer shall not "habitually violate an established rule of procedure or of evidence."  Tex. Disciplinary R. Pro. Conduct 3.04(a), (c)(1). The Court will analyze UDF's arguments in separate sections which address AUSA Bunch's actions in relation to the filter team, the forensic auditors, the BIDMAS malfunction, and the taking of screenshots.

UDF alleges that AUSA Bunch's violated its attorney-client privilege by abusing or neglecting the filter team procedure.  As threshold matters, the Courts **FINDS** AUSA Bunch did not commit an ethical violation of UDF's attorney-client privilege by obtaining a search warrant for UDF headquarters instead of taking a "less intrusive approach," as preferred by UDF.  (Notice

---

These Standards are intended to provide guidance for the professional conduct and performance of prosecutors. They are written and intended to be entirely consistent with the ABA's Model Rules of Professional Conduct, and are not intended to modify a prosecutor's obligations under applicable rules, statutes, or the constitution. They are aspirational or describe 'best practices,' and are not intended to serve as the basis for the imposition of professional discipline.

ABA Standards for Criminal Justice, Prosecution Function, Standard § 3-1.1(b); *see also Strickland v. Washington*, 466 U.S. 668 (1984) (finding that ABA Standards "are guides to determining what is reasonable, but they are only guides."). Similarly, the DOJ's Justice Manual "provides internal DOJ Guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ." Justice Manual, § 1.1200.

This District has adopted the Texas Disciplinary Rules as its minimum ethical standards. Notably, courts in the Fifth Circuit are not limited to their respective state codes. The Fifth Circuit broadened the ethical standards applicable to all lawyers practicing in the Fifth Circuit, holding that compliance with local disciplinary rules was not in and of itself sufficient, and that conduct of lawyers practicing in the Fifth Circuit should look at ethical rules "announced by the national profession in light of the public interest and the litigants' rights." *See In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)

Accordingly, the Court **FINDS** the Texas Rules of Evidence and Rules of Criminal Evidence, the ABA standards for Criminal Justice, and the DOJ's Justice Manual, to the extent UDF is seeking of this Court a finding of *ethical violations* with respect to the attorney-client privilege, inapplicable to this miscellaneous action. The district court does have authority to determine rules for conduct of attorneys for the purposes of identifying conduct subject to *sanctions*, though a request for sanctions is not before the Court. *See In re Dresser*, 972 F.2d at 544. Accordingly, the Court will only address the alleged ethical violation of the attorney-client privilege with respect to the Federal Rules of Evidence and the Texas Disciplinary Rules.

at 5.) *see Zurcher v. Stanford Daily*, 436, U.S. 547 (1978) (explaining the validity of choosing to obtain a search warrant instead of a subpoena early in criminal investigations). Next, the Court notes UDF and its executives' Motion for *Franks* Hearing was denied on November 17, 2021. (*See* ECF No. 34, Case No. 4:21-CR-289.) Accordingly, the Court will not engage in a discussion of *Franks* as applicable to this miscellaneous action. The Court **FINDS** that the documents at issue were lawfully seized pursuant to a valid warrant, which was based upon a finding of probable cause.

The emergent answer to balancing concerns of extensive physical evidence and electronically stored information ("ESI") obtained from the execution of a search warrant is the Government's use of a filter team. *United States v. Ritchey*, No. 1:21-CR-6-HSO-RPM 2022 WL 3023551, at *5 (S.D. Miss. June 3, 2022). Across the Circuits "[t]he use of a filter team is a common procedure . . . and has been deemed adequate in numerous cases to protect attorney-client communications." *Id.* (quoting *In re Search Warrants Executed on Apr. 28, 2021*, No. 21-MC-425 (JPO), 2021 WL 2188150, at *2 (S.D. N.Y. May 28, 2022) (citations omitted)); *see also United States v. Satary*, 504 F. Supp. 3d 544, 555 (E.D. La. 2020). Inevitably, the use of a filter team "present[s] inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors." *In re Grand Jury* Subpoenas, 454 F.3d 511, 523 (6th Cir. 2006) (citing *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991)). Essentially, a filter team is "the government's fox . . . left in charge of the [privilege-holder's] henhouse, and may err by neglect or malice, as well as by honest differences of opinion." *Id.*

Typically, to dispel the naturally occurring suspicion of filter teams, the Government will seek court approval of its filter team protocol in either an adversarial context or by an informal, good-faith resolution with the defendant. *See Ritchey*, 2022 WL 3023551 at *5 (quoting *Satary*,

504 F. Supp. 3d at 555); *United States v. Sledziejowski*, No. 3:16-CR-101-B, 2018 WL 2288962, at *1 (N.D. Tex. May 18, 2018); *Heebe v. U.S.*, No. 10-3452, 2012 WL 3065445 (E.D. La. Jul. 27, 2012); *see also In re Ingram*, 915 F. Supp. 2d 761 (E.D. La. 2012) (the *Ingram* protocol provided that non-privileged documents would be reviewed by Ingram's lawyers who would be given the opportunity to challenge the filter team's determination and, if the attorneys could not agree on the privilege, the Court would resolve the dispute; only when all privilege determinations were final, would the non-privileged documents be submitted to the case agent for use in the investigation and copies of the privileged documents would be sequestered within the filter agent's and prosecution team's files).

It is undisputed that the idyllic *Ingram* protocol identified above did not occur in conjunction with the Government raid of UDF's headquarters, despite the foreseeably enormous amount of physical evidence and ESI that would be obtained during the raid. Instead, the Government chose to implement its own filter team review without informing UDF (or the Court) of the filter team's protocols. *See Ritchey*, 2022 WL 3023551 at *6 (questioning the adequacy of the filter team's protocol when "the Government unilaterally created a protocol and did not take steps to fully apprise [defendant] about this protocol" and "did not reveal any portion of its protocol until more than a year after executing the [search warrant].") In this way, the USAO failed to provide UDF and its executives an opportunity to *adequately* challenge the filter team's determination of PPM. *See Heebe*, 2012 WL 3065445 at *4; *Ingram*, 915 F. Supp. 2d 761 (E.D. La. 2012). Likewise, counsel for UDF and its executives did not ask the Court to examine or implement a protocol for segregation of potentially privileged documents until six years after the raid. These decisions, made by all parties, resulted in less-than-ideal, behind-closed-doors

segregation of PPM and the inevitable allegations that there may have been leaks of privileged material to the prosecution team.

From the record, it is clear that AUSA Bunch was effectively the lead AUSA on the UDF investigation from its inception. (*See generally* Bunch Decl.)  He spearheaded the initial raid on UDF's headquarters and served in a liaison capacity between counsel for UDF, the executives and the filter team. (*Id.*)  AUSA Bunch maintains he "began considering how to protect attorney-client privileged information well before the FBI executed a search warrant at UDF's corporate headquarters in February 2016." (*Id.* at 2.)  He went up his chain of command at the USAO and received ratification from his supervisors for the search warrant, raid, and subsequent filter team protocol. (*Id.* at 3.)  Essentially, he received a blessing for each action or inaction in this investigation. (*Id.*)  By his account, in February 2016, AUSA Bunch "engaged in good-faith efforts" with Barrett Howell ("Howell"), UDF's counsel, to discover PPM within ESI, with Howell providing AUSA Bunch a list of search terms containing several of law firms and hundreds of individual attorneys. (*Id.* at 5.)  With Howell's permission, AUSA Bunch shared the list with counsel for UDF executives in an effort to expand the search. (*Id.*)  Of course, Howell's search terms were easily applied to the ESI. (*Id.*)  The physical documents, on the other hand, required a manual search. (*Id.*)

The physical documents at issue contain, *inter alia*, documents from Melissa Youngblood, who, apparently, served a dual role of business employee and general counsel for UDF.  AUSA Bunch claims, in 2016 and in 2018, he "made multiple efforts with Mr. Howell to determine the parameters of UDF's assertion of privilege with respect to Ms. Youngblood's business and legal roles at UDF." (Bunch Decl. at 7-9.)  Two years after the raid, in May 2018, AUSA Bunch communicated with Howell and Howell reviewed physical boxes of PPM from Youngblood's

office and surrounding materials. (*Id*. at 7.)  Howell and the filter team notified AUSA Bunch of certain boxes that contained PPM. (*Id*. at 8-9.)

The complicated record in this miscellaneous matter, as well as its companion civil, miscellaneous, and criminal cases, are a good example of why courts historically have been suspicious of filter teams and further support the propriety of the *Ingram* protocol and the process of the Government seeking court approval of its filter team protocol pre-search. While there are instances of appropriate collaboration between the parties, the record reveals rampant discoordination based on vague and/or imprecise records such as post-it notes, miscellaneous documents, phone calls, emails, and fading memories spanning more than two years of attempted coordination of efforts.

Essentially, the Court finds that AUSA Bunch and the filter team were, for all intents and purposes, acting in good-faith and utilizing the filter team protocol regarding the Youngblood documents and that UDF and its executives were sporadically communicated with on an as-needed/on-going basis.  This does not mean that valid criticisms of the filter team process utilized in this matter are not warranted.  Given the extensive seizure of information and the following investigation, it is both understandable and foreseeable that there would be certain instances where the prosecution team (including AUSA Bunch) would come across PPM, especially in hard copy form maintained in physical boxes.  The Court questions why supervisors at the USAO, who were, according to AUSA Bunch, blessing his every move, permitted such a disjointed filter team protocol and did not see the necessity of active communication between all parties and the courts to avoid these foreseeable issues.  Perhaps the USAO and its supervisors were simply oblivious to, or underestimated, the enormity of the scope of documents which might involve PPM in this investigation, or AUSA Bunch was, at times, disorganized, inconsistent, and/or un-timely in his

communications with his supervisors and the UDF parties and representatives. Regardless, to ensure the highest standards of ethical conduct and professionalism which the Justice Department so frequently proclaims, the USAO must do a better job ensuring its attorneys, like AUSA Bunch, act ethically, promptly, and professionally in all respects. Perhaps if greater efforts to safeguard PPM and a "best practices" use of filter team protocols had been employed in this investigation, this miscellaneous action would not be before the Court. However, the Court declines to find an ethical violation by AUSA Bunch and the USAO filter team process in this matter. While imperfect and, at times, disorganized, the record does not support a finding that AUSA Bunch unlawfully obstructed opposing counsel's access to evidence or that he violated any rule of procedure or evidence by intruding on UDF's attorney-client privilege in conjunction with the filter team as alleged by UDF. *See* Tex. Disciplinary R. 3.04(a), (c)(1). Accordingly, the Court **FINDS** AUSA Bunch did not intrude upon or violate UDF's attorney-client privilege regarding his involvement with the filter team.[10]

### 3.      The Forensic Auditors

The Court turns to UDF's allegation that AUSA Bunch violated its attorney-client privilege when UDF's attorney-retained forensic auditors ("FAs") were interviewed. The two FAs—John Riley ("Riley") and Anthony Creamer ("Creamer")—worked for Navigant, a firm UDF retained

---

[10] UDF also asserts that AUSA Bunch violated the attorney-client privilege by failing to employ a *continuous* filter team. AUSA Bunch acknowledges that AUSA Hoxie's departure from the Dallas office—though she remained available for "consult" with subsequent filter attorneys—did leave a gap in the filter team. (Bunch Decl. at 14.) Importantly, Bunch notes that UDF attorney "Mr. Howell knew that AUSA Hoxie had left the [USAO] in Dallas. He continued to communicate with the subsequent FBI filter attorney, other agents, and me concerning filter-related issues. He never complained about the absence of a filter AUSA assigned to the case." *Id.* It is foreseeable that throughout a lengthy investigation and filter process there may be attorney turnover within the filter team. Conversely, it is not reasonable for UDF and its executives to complain—nearly seven years after the headquarters raid and after Howell and counsel for UDF executives continued to communicate with the filter team with ease—of the filter team's changing personnel. Consequently, the Court **FINDS** Bunch did not violate UDF's attorney-client privilege with respect to failing to maintain a continuous filter team.

for multiple projects in 2014. (Bunch Decl. at 10.)  In his declaration, AUSA Bunch submits he was aware of the potential privilege issues if the USAO interviewed Navigant. (*Id*.)  Bunch claims he spoke with Howell in August 2018 about interviewing Navigant and Howell indicated he would speak with UDF trustees and get back with AUSA Bunch on the matter.  However, the record does not reflect that this ever happened or that AUSA Bunch ever followed up with Howell.  Instead, in February 2019, Agent Edson, AUSA Bunch's counterpart, interviewed Riley and Riley informed her, *inter alia*, that Creamer had more information on specific UDF loans.  [ECF No. 129 at Ex. C., pg. 2, Case No. 4:21-CR-289-O].  Agent Edson and AUSA Bunch then interviewed Creamer later that month.  (Bunch Decl. at 11.)  Regarding his interview with Creamer, AUSA Bunch claims that Creamer told AUSA Bunch and Agent Edson that he was retained on three projects.  (*Id*.)  AUSA Bunch also claims that he and Agent Edson "instructed [Creamer] not to discuss with [them] anything concerning the projects for which his firm had been retained by counsel." (*Id*.)  Accordingly, AUSA Bunch maintains he and Agent Edson did not ask Creamer any "questions concerning his work at counsel's direction." (*Id*.)

Interestingly, a review of Creamer's FBI 302 form[11] reveals a slightly different narrative. The form reads that Creamer "thought the first two engagements [with his former employer, Navigant] were made through UDF counsel," and he was "not certain if the third engagement was made through UDF counsel or directly by UDF." [ECF No. 129, Ex. D, pgs. 2-3, Case No. 4:21-CR-289-O].  The form reflects that Creamer then gave information regarding his basic responsibilities and functions at Navigant, providing Agent Edson and AUSA Bunch "an abstract example, not specific to Navigant's work at UDF." (*Id*. at 3.)  Creamer also gave responses to Agent Edson and AUSA Bunch regarding "relevant documents" containing "a cash flow

---

[11] An FBI 302 form is the form used by FBI agents to memorialize and summarize an interview.

spreadsheet for the Buffington Land portfolio, which Navigant included in its production of records in response to a Federal Grand Jury subpoena" that Agent Edson had emailed Creamer for his review prior to his interview. (*Id.*) Regarding the e-mailed spreadsheet documents, Creamer told Agent Edson and AUSA Bunch that "he thought it was inappropriate to count future cash flows or streams of income that were not under contract." (*Id.*) Agent Edson and AUSA Bunch "informed [Creamer] of the status of the future or additional projects added to the cash flow projection spreadsheet [and] Creamer stated, 'I'm speechless.'" (*Id.*)

Because the Court has previously determined Agent Edson—in her non-attorney role as an FBI investigator—did not violate any ethical rules by her conduct, the Court will not address her interview with Riley or her role in Creamer's interview in the context of an ethical violation. As for AUSA Bunch, the Court is troubled by AUSA Bunch's conduct as an attorney in several respects. First, his lack of communication with Agent Edson regarding interviewing the FAs. He *should have* communicated with his colleague that interviewing the FAs could potentially cause a privilege intrusion issue and that he was awaiting to receive Howell's express consent to conduct the interviews. It is also troubling that AUSA Bunch did not follow up with Howell after their initial discussion in August—he *should have* found time in the six months between his initial conversation with Howell and Riley's interview. Undoubtedly, his failure to communicate with opposing counsel and his team exhibits poor judgment, a lack of diligence, or both.

However, the substance of Creamer's interview keeps AUSA Bunch, albeit barely, on the safe side of an ethical violation. The FBI 302 form reveals that Creamer *did not* divulge privileged information to AUSA Bunch. [ECF. No. 129, Ex. C., Case No. 4:21-CR-289]. Background information, "abstract examples," and Creamer's take on a cash-flow spreadsheet subject to a grand jury subpoena do not invade UDF's attorney-client privilege. As stated, the Court does not

consider AUSA Bunch's actions in this regard to reflect a "best practice," but they do not rise to the level of violating established rules of procedure or evidence or obstruct UDF's access to evidence. *See* Tex. Disciplinary R. 3.04(a), (c)(1). Because there is no evidence that AUSA Bunch obtained any attorney-client privileged information from the FAs, the Court **FINDS** he did not invade or violate UDF's attorney-client privilege.

### 4.       The BIDMAS Malfunction

The Court will now address UDF's allegation that AUSA Bunch violated the attorney-client privilege by "[r]efusing" to notify all parties and the Court that the FBI BIDMAS electronic document review system was malfunctioning and, therefore, supplied the prosecution team with PPM. (Notice at 5.) Information on this allegation is scant. UDF makes a blanket allegation in its Notice and asserts in its Reply that "Bunch did not use BIDMAS to review the scanned documents." (Omnibus Reply at 32.)

For his part, AUSA Bunch states he first accessed BIDMAS at the FBI headquarters in September 2018 and that he "noticed an email that had not been flagged [as PPM]," he "did not remember the substance of the email," and he "did not study it or consider it long enough to describe it." (Bunch Decl. at 12.) Upon finding this questionable email, AUSA Bunch states that he "immediately stopped [his] review and alerted Agent Edson, who took immediate remedial steps." (*Id.*)

Interestingly, the facts before the Court, as provided by both UDF and AUSA Bunch, do not address the nature of the BIDMAS malfunction at all. Based on the limited information before the Court, AUSA Bunch's actions do not show a violation of an established rule of procedure or evidence and do not show an obstruction of UDF's access to evidence. Therefore, with respect to

any alleged BIDMAS malfunction, the Court **FINDS** that AUSA Bunch did not invade or violate UDF's attorney-client privilege.

### 5. The Taking of Screenshots

UDF also claims that AUSA Bunch violated its attorney-client privilege by "[a]ctively requesting that an FBI agent intrude" into PPM that "had been segregated by the FBI filter team by secretly penetrating the screen and taking 'screen shots' of the non-cleared segregated information." (Notice at 5.) In its Notice and Omnibus Reply, UDF directs the Court to its executives' previously filed Motion to Reconsider Motion to Dismiss where it argues that forensic analyst Scott Martinez ("Martinez") on various occasions breached filter protocol by, *inter alia*, taking "a screenshot of the UDF Attorney Youngblood email (rather than downloading a PDF as he had done for the non-filtered materials), and [] forward[ing] the image to the Prosecution Team Lead Agent for further circulation among the Prosecution Team."[12] (*See* Notice at 5; Omnibus Reply at 37; and ECF No. 275, pg. 8, Case No. 4:21-CR-289-O.) UDF claims that AUSA Bunch "sought and received" the "surreptitiously captured 'screenshot'" of the blocked information." (Omnibus Reply at 17.) On the other hand, AUSA Bunch argues that he was unable to see "what is behind the blocked information in FOA Martinez' email, but that is the point. It was restricted from viewing by the investigative team." (Bunch Decl. at 14.)

Based on the foregoing, the record before the Court does not support a finding that AUSA Bunch violated a rule of procedure or evidence, or that he prevented UDF or its executives' ability

---

[12] In their Motion to Reconsider, the executives state they "are unable to evaluate the extent of the prejudice they have suffered based on FBI Analyst Martinez's access to and viewing of privileged and potentially privileged materials." [ECF No. 275, pg. 10, Case No. 4:21-CR-289-O (emphasis omitted)]. To date, neither the executives nor UDF have informed the Court of any alleged material harm caused only by alleged screenshots, despite their numerous subsequent filings, including UDF's Notice.

to access evidence.  Therefore, the Court **FINDS**, with respect to the alleged shared screenshots, AUSA Bunch did not invade or violate UDF's attorney-client privilege.

**B.**    **Duty of Candor**

The Court now turns to UDF's allegation that the USAO violated its duty of candor to the Court.[13]  To begin, "[a]n attorney owes a duty of candor and honesty to the court, and at the very least a duty to not misrepresent the facts to a judge or opposing counsel." *Tex. v. United States*, No. B-14-254, 2016 WL 3211803, at *8 (S.D. Tex. May 19, 2016).   The pertinent Texas Disciplinary Rules are as follows:

Rule 3.03. Candor Toward the Tribunal

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

(2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act;

(3) in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact which the lawyer reasonably believes should be known by that entity for it to make an informed decision;

(4) fail to disclose to the tribunal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(5) offer or use evidence that the lawyer knows to be false.

(b) If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts.

---

[13] The Court, based on its previous discussion, again **FINDS** the ABA Standards for Criminal Justice, and the DOJ's Justice Manual, to the extent UDF is seeking a finding of *ethical violations* with respect violations of the duty of candor, inapplicable to this miscellaneous action. *See* n. 9, *supra*.  The Court will address UDF's arguments only in the context of the Texas Disciplinary Rules and with attention to the national standard.

(c) The duties stated in paragraphs (a) and (b) continue until remedial legal measures are no longer reasonably possible.

\* \* \* \*

Rule 4.01. Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client.

\* \* \* \*

Rule 8.04. Misconduct

(a) A lawyer shall not:

> (1) violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

> (2) commit a serious crime or commit any other criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

> (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

Tex. Disciplinary R. Pro. Conduct 3.0, 4.01, and 8.04.

Candor is required by all rules of ethics that could possibly apply here. One definition of "candor" describes it as being "[t]he quality of being open, honest and sincere." *Candor,* Black's Law Dictionary (10th ed. 2014). The "duty of candor" under which lawyers operate is a bit broader. It is a "duty to disclose material facts; esp[ecially], a lawyer's duty not to allow a tribunal to be misled by false statements, either of law or of fact, that a lawyer knows to be false." (*Id.*) Most legal authors and scholars would also include that it is a lawyer's duty not only to be honest

but also not to mislead or allow a court to be misled by half-truths or statements which, while technically honest, are calculated to mislead. Model Rules of Pro. Conduct R. 3.3 cmts. 2, 3 (Am. Bar. Ass'n 2013).

Further, compliance with the above Texas ethical rules has been mandated by federal law since 1998 when Congress enacted the "McDade Amendment," which reads, in pertinent part:

§ 530B. Ethical standards for attorneys for the Government

(a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

(b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

28 U.S.C. § 530B. Turning to national standards, to the extent represented by the Model Rules of Professional Conduct promulgated by the ABA, the model rules do not contradict the Texas Disciplinary Rules. The pertinent model rules are as follows:

Rule 3.3 Candor Toward the Tribunal

(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

* * *

Rule 4.1 Truthfulness in Statements To Others

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person.

* * *

Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

Model Rules of Pro. Conduct R. 3.3, 4.1, and 8.4 (Am. Bar. Ass'n 2013).

As stated above, UDF's candor argument centers on the USAO's disclosures to the Court and UDF's counsel at the November 23, 2021, status conference on UDF's 41(g) motion. UDF claims that the USAO was "aware that those representations [made at the November 23, 2021 status conference on UDF's Rule 41(g) motion] were[,] at best, inaccurate." (Notice at 7.) UDF also claims that the prosecution failed to inform the Court at the status conference that, in an interview a week prior with Agent Edson, the USAO learned that there were "multiple additional privilege breaches." (*Id*. at 9.)

The Court first examines the background leading up to the Government's statements made at the November 23, 2021, 41(g) status hearing. At some point, the Government discovered— nearly six years after UDF's headquarters raid and immediately upon UDF's filing its 41(g) motion—that member of the prosecution team had been potentially exposed to privileged information. The AUSA handling the 41(g) motion for the Government was assigned to the matter in April 2021 and given the unfortunate task of attempting to re-trace a five year, at times disjointed, investigation. (*See generally* USAO Resp. at 1.) On October 25, 2021, the AUSA filed an initially sealed Government's Sealed Notice to the Court, eight days before the 41(g) status

conference. (ECF No. 19, Case No. 3:21-MC-284-B-BT.) The Court set the hearing for November 23, 2021, leaving eight days for UDF to review the Government's initial sealed notice and supplement.

While the timing of the Government's finding that there may have been a potential privilege exposure and is suspicious to UDF, it is clear that the USAO, *on its own,* filed its sealed notice and supplement with the Court to ensure it complied with its duty of candor. The Government's initial sealed notice and supplement constituted a good-faith effort at transparency and an assurance that the Government would continue to look into the listed issues. In accordance with its duty of candor, the Government continued to update the Court and counsel on its findings, and UDF had a little over a week to review the sealed notice and supplement before the 41(g) status conference on November 23, 2021.

Having made the initial sealed and supplement notices in accordance with its duty of candor, it does not logically follow that the USAO would enter the 41(g) status conference with the intent to suddenly "hide-the-ball." At the hearing, when questioned regarding the 7.4 million privilege term "hits" and the prosecution team's review of 120 physical boxes containing potentially privileged information, the USAO asserts that the questions were answered "succinctly, and to the best of [the AUSA's] knowledge." (USAO's Resp. at 3.) Being assigned to the case for roughly six months and having made two disclosures to the Court and UDF's counsel, with a continued duty of disclosure, it is reasonable that, at the 41(g) conference, the AUSA would not belabor issues of uncertainty and would not commit to statements that the USAO was still investigating. The record supports that the AUSA's statements to the Court were truthful and an apt disclosure of material facts.

The Court now turns to UDF's specific argument that the USAO knew and failed to disclose at the 41(g) status conference that, a week before the conference, Agent Edson informed the USAO that there were additional privilege breaches. In its supplement, provided four days prior to the 41(g) status conference, the Government stated that FBI 302 interview forms "were in progress" and that there were members of the prosecution team that reviewed physical boxes of documents collected during the search "on additional dates besides those documented" in the reports attached to the initial sealed notice. (USAO Resp. at 7-8.) Accordingly, UDF knew, or should have known, four days prior to the 41(g) status conference, that there would be more information forthcoming from the Government regarding the FBI 302 forms and additional disclosure dates. The Government, as stated in its supplement, did produce the FBI 302 forms and additional potential privilege disclosure information on December 20, 2021. Although UDF contends an FBI 302 form from the November 12, 2021, interview with Agent Edson should have been produced and disclosed within nine days from its creation at 41(g) status conference on November 23, 2021, the Court finds the USAO *did* timely notify UDF that it was in the process of obtaining FBI 302 forms and that there could be additional potential privilege breach disclosures. Again, after having been forthcoming regarding disclosing the prosecution's potential privilege breaches, the USAO continued to satisfactorily comply with its duty of candor and notified the Court and UDF that more information would be forthcoming. Accordingly, the Court **FINDS** the USAO did not violate its duty of candor in relation to the FBI 302 forms' contents, disclosures, or timeliness.

Based on the foregoing, the Court **FINDS** the information the USAO supplied the Court, counsel for UDF, and its executives was not false, misleading, or made in bad faith and that the AUSA did not act with misconduct at the 41(g) status conference. The record also supports that

the subsequent AUSAs that inherited the underlying six-year investigative mess acted ethically and with candor in disclosing to the Court and UDF counsel their discoveries and continued findings. Accordingly, the Court **FINDS** the USAO did not violate its duty of candor and has fully complied with the Texas Disciplinary Rules and the parallel national standards.

## V.    CONCLUSION

Having examined UDF's allegations under the Texas Disciplinary Rules and the parallel national standards, the Court **FINDS** Agent Edson and AUSA Bunch did not invade or violate the attorney-client privilege and the USAO did not violate its duty of candor. Therefore, the Court **RECOMMENDS** no finding of ethical violations for Respondents.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending time to file objections to 14 days).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **February 20, 2023,** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED February 6, 2023.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE